UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Barbara Fitts</u>

      v.                            Civil No. 22-cv-559-LM
                                       Opinion No. 2023 DNH 114 P

<u>Kilolo Kijakazi,</u>
<u>Acting Commissioner of Social Security</u>

**O R D E R**

Plaintiff Barbara Fitts brought this action seeking judicial review of the decision of the Acting Commissioner of the Social Security Administration denying her applications for disability insurance benefits and supplemental social security income under Titles II and XVI of the Social Security Act.  Fitts moves to reverse the Acting Commissioner's decision (doc. no. 5), and the Acting Commissioner moves to affirm (doc. no. 7).  Fitts argues that the Administrative Law Judge ("ALJ") erred by concluding that Fitts retains a residual functional capacity ("RFC") to perform light work with some additional limitations.  Fitts argues that the ALJ erred by constructing an RFC without support from an expert medical opinion; by failing to give proper weight to the opinion of a treating physician; and by discounting Fitts's statements about the intensity, persistence, and limiting effects of her symptoms.

The court agrees with Fitts that the ALJ erred by improperly weighing the opinions of her treating medical provider and by constructing an RFC without substantial evidence and, in particular, without support from a medical opinion.

The Acting Commissioner's decision is vacated and the matter is remanded to the Acting Commissioner for further proceedings consistent with this order.

## STANDARD OF REVIEW

In reviewing the final decision of the Commissioner under 42 U.S.C. § 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Sacilowski v. Saul, 959 F.3d 431, 437 (1st Cir. 2020). The court defers to the ALJ's factual findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted). Rather, the court "must uphold the [Acting] Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion." Id. (citation and internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

The Social Security Administration's regulations set out a five-step process that ALJs must follow to evaluate whether a person is "disabled" under the Social

Security Act—that is, unable to engage in any "substantial gainful activity."  See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520.[1]  The five steps are as follows:

- **Step One**: If the claimant is presently engaging in substantial gainful activity, she is <u>not</u> disabled. § 404.1520(b).

- **Step Two**: If the claimant does not have any impairment or any combination of impairments that significantly limits her physical or mental ability to do basic work activities, she is <u>not</u> disabled because she lacks a "severe" impairment.  § 404.1520(c).

- **Step Three**: If any of the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she <u>is</u> disabled—and the ALJ need not proceed to steps four and five. § 404.1520(d).

- **Step Four**: If the claimant's impairments do not prevent her from doing her past relevant work, then she is <u>not</u> disabled.  § 404.1520(e)-(f).

- **Step Five**: If the claimant's impairments do not prevent her from doing other work that exists in the national economy, then she is <u>not</u> disabled.  § 404.1520(g).

At steps one through four, the claimant has the burden of proof.  Sacilowski, 959 F.3d at 433-34.  At step five, however, the Commissioner has the burden of proof.  Id.

If the claimant meets her burden at the first two steps of the sequential analysis, but not at the third, the ALJ proceeds to steps four and five, which begin

---

[1] Unless otherwise noted, the court will cite the regulations under Title II (disability insurance), 20 C.F.R. pt. 404, which are not materially different from those under Title XVI (supplemental income), 20 C.F.R. pt. 416, in the context of this case. See, e.g., Kimball v. Kijakazi, No. 21-cv-943-LM, 2022 WL 2702819, at *1 n.1 (D.N.H. July 7, 2022).

with a determination of the claimant's "residual functional capacity," i.e., a determination of what kind of things the claimant can and cannot do, mentally and physically.  See 20 C.F.R. § 404.1545(a)(1).  A person's RFC is an assessment of "the most" the claimant can do despite her limitations.  Id.  After the ALJ formulates the claimant's RFC, she compares that assessment against the demands of the claimant's past work (at step four) and against other jobs that exist in the national economy (at step five).  § 404.1520(e)-(g).  If the claimant's RFC allows her to perform her past relevant work or work that exists in the national economy, the claimant is not disabled.  See § 404.1520(a)(4)(iv)-(v), (e), (f).

## BACKGROUND

Fitts applied for disability insurance benefits and supplemental security income in September 2020.  Fitts claimed a disability beginning August 10, 2020, alleging impairments of vestibular[2] problems, dizziness, vertigo, and benign paroxysmal positional vertigo.  The Social Security Administration denied Fitts's claims, and Fitts requested reconsideration.  The Social Security Administration

---

[2] "Vestibular" generally means relating to or affecting "the perception of body position and movement."  See Vestibular, Merrriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/vestibular (last visited August 17, 2023).  The vestibular system "includes the parts of the inner ear and brain that help control balance and eye movements."  Vestibular Symptoms, Vestibular Disorders Association,   https://vestibular.org/article/what-is-vestibular/vestibular-symptoms/ (last visited August 17, 2023).

upheld the denial, and Fitts then requested a hearing before an ALJ.  The ALJ held a hearing by telephone in December 2021.[3]

During the hearing, Fitts and a vocational expert testified.  In addition to the medical record, the evidence before the ALJ included two opinions from a treating physician, Dr. Sean Wise, and opinions from two state-agency consultants who reviewed the medical record, Drs. James Trice and Ilonna Rimm.

I.    Medical Opinions

A.    Dr. Wise's Opinions

Dr. Wise provided an opinion in April 2021 and another opinion in October 2021.  AR at 435-38 (October 2021 Opinion); id. at 391-92 (April 2021 opinion).  Dr. Wise is an assistant professor of surgery in otology and neurotology at the Geisel School of Medicine at Dartmouth-Hitchcock Medical Center.  He is a board-certified specialist in otolaryngology[4] and subspecialist in neurotology.[5]

---

[3] The ALJ held the hearing by telephone with the assent of all parties because of the extraordinary circumstances presented by the COVID-19 pandemic.

[4] Otolaryngology refers to the ears and throat.  Otolaryngologists are commonly known as "ENTs," which stands for "ear, nose, and throat."  See Otolaryngolist, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/24635-otolaryngologist (last visited August 22, 2023).  The full name of the board certification is "Otolaryngology – Head and Neck Surgery."  What we certify, American Board of Otolaryngology – Head and Neck Surgery, https://abohns.org/about-our-certifications/what-we-certify (last visited August 22, 2023).

[5] "A Neurotologist is a subspecialist within Otolaryngology – Head and Neck Surgery who has completed additional accredited training and passed an exam focused on diseases of the lateral skull base and temporal bone region."  What we certify, American Board of Otolaryngology – Head and Neck Surgery, https://abohns.org/about-our-certifications/what-we-certify (last visited August 22, 2023).

In his April 2021 opinion, Dr. Wise wrote that Fitts had been in his care at Dartmouth-Hitchcock Medical Center from June 4, 2020, through the then-present date (April 21, 2021). He stated that Fitts has "a history of positional vertigo with presumed benign positional vertigo, with clinical course complicated by maladaptive vestibular compensation congruent with persistent postural perceptual dizziness, with likely additional cervicogenic dizziness trigger." Id. at 392. He stated that Fitts "has undergone an extensive vestibular evaluation," identified some of the tests, and asserted that "[d]espite medication management and continued, aggressive, specialized vestibular therapy through Physical Therapy, [Fitts] has experienced continued baseline disequilibrium with unpredictable episodic dizziness exacerbations lasting hours to days." Id. Dr. Wise described Fitts's symptoms as "fluctuating" and "unpredictable," such that they were "severely limiting, and have variably impacted this patient's inability to maintain activities of daily living, her ability to safely drive a vehicle, and have adversely impacted her capacity to effectively maintain participation at work." Id.

Dr. Wise's second opinion, dated October 22, 2021, is primarily a form opinion with some elaboration offered in the margins. See id. at 438. Dr. Wise stated that Fitts has diagnoses of positional vertigo with benign persistent postural perceptual dizziness complicated by maladaptive vestibular compensation; benign paroxysmal positional vertigo; disequilibrium; bilateral aural fullness; and bilateral tinnitus. He answered "Yes" to a question on the form about whether Fitts had dizziness and added that it was "in addition to the paroxysmal positional vertigo." Id. at 435. He

6

indicated that Fitts had daily dizziness and paroxysmal positional vertigo episodes and that Fitts did not always have warning of impending dizziness. As such, Dr. Wise stated that Fitts cannot always take safety precautions before she feels an episode occur. Dr. Wise stated that Fitts's dizziness did not occur at a particular time of day but that "symptoms can increase/worsen with increased movement. Exacerbations somewhat unpredictable." Id. at 435. "Stress or anxiety of any kind" were precipitating factors. Id. at 436. Symptoms associated with Fitts's dizziness included malaise; photosensitivity; sensitivity to noise; hot flashes; visual disturbances; mood changes; mental confusion/inability to concentrate; fatigue/exhaustion; and sleep disturbances. Id.

In response to questions about the duration and after-effects of "episode[s]," Dr. Wise clarified that the effects of dizziness were "constant" or "not episodic," meaning that "dizziness is a constant with variable intensity with variable associated symptoms, as outlined above." Id. Dr. Wise stated that Fitts was prescribed "Meclizine as needed," but it made Fitts "very sleepy." Id. Dr. Wise stated that Fitts also took Zofran as needed for nausea.

Dr. Wise opined about Fitts's functional impairments, stating that Fitts was "unable to work"; she could not work at heights; could not work with power machines that require an alert operator; could operate a motor vehicle "on occasion"; and could not take a bus alone. Id. at 436-38. Dr. Wise also noted that Fitts had irritability/mood changes; was socially isolated; had a short attention span; and had memory problems.

Dr. Wise elaborated that Fitts was unable to work because she was unable to tolerate hours of working; standing; or turning because of disequilibrium and persistent postural perceptual dizziness.  Dr. Wise indicated that if Fitts were to work, she would require frequent breaks.  He stated that Fitts was likely to be "off task" while working 25 percent or more of the time, and her impairments were likely to produce good days and bad days.  Id. at 437.  He estimated that Fitts was likely to be absent from work more than four days per month and would have to leave work early or arrive late because of her impairments more than four days per month (assuming she was attempting to work full time).  Dr. Wise indicated that Fitts's physical and mental impairments, in his opinion, were reasonably consistent with the symptoms and limitations described.

II.   <u>State Agency Consultant Opinions</u>

Two state-agency consultants also rendered opinions based on their reviews of the medical records.

Dr. James Trice, an internal medicine physician, issued an opinion on February 26, 2021.  Dr. Trice stated that Fitts had a medically determinable impairment, namely, "vertiginous syndromes and other disorders of vestibular system" which he determined to be "non severe."  <u>Id.</u> at 78.  He indicated that there was evidence in the medical file for other impairments, but the evidence was insufficient to establish a diagnosis.  Dr. Trice wrote that in January 2021 Fitts's "VNG testing [was] normal; symptoms reported to be improved with PT in claimant with longstanding [benign paroxysmal positional vertigo]" and in February 2021

8

"VEMP testing [was] normal; claimant denies any hearing difficulty[.]  Uses meclizine sporadically though it causes sedation[.]"  Id.  Dr. Trice's opinion was that Fitts was not disabled because she did not have any severe medical impairments. Dr. Trice did not explain further how the medical testing led to his conclusion.

Additionally, Dr. Trice stated "Yes" in response to a question on the form used for his opinion asking whether Fitts's "statements about the intensity, persistence, and functionally limiting effects of the symptoms" were "substantiated by the objective medical evidence alone."  Id.  He likewise checked "Yes" in response to a question asking whether Fitts's medically determinable impairments could "reasonably be expected to produce the individual's pain or other symptoms."  Id. Dr. Trice did not issue an opinion about Fitts's RFC, stating that "No RFCs are associated with this claim."  Id.

Dr. Ilonna Rimm, a family and general physician, issued an opinion on August 19, 2021, after Fitts requested reconsideration of the Acting Commissioner's initial denial of her application.  Dr. Rimm's evaluation was as follows:

> [T]his 58 year old claimant alleges that there are no changes and she has submitted additional [medical records].  The claimant has benign positional vertigo and she has received [physical therapy], which has generated improvement.  She is otherwise well.  She uses meclizine sporadically though it causes sedation.  She can cook, clean, shop and drive.  Not severe.

Id. at 88.  Like Dr. Trice, Dr. Rimm did not offer an opinion about Fitts's RFC.

III.   <u>Fitts's reports about her limitations</u>

Fitts filled out documentation alleging her limitations and testified during the hearing.  During the hearing, Fitts testified that she had a longstanding history of intermittent vertigo and dizziness issues, but in early August 2020 she had a particular "attack" that was "very, very bad" from which she has yet to fully recover. <u>Id.</u> at 44.  Fitts described her symptoms in August 2020 as "absolutely debilitating in the worst sense." <u>Id.</u> at 45.  For example, she explained that she "could be looking at the wall and just shift my eyes over and look at something else and my head would just explode with all these sensations in it." <u>Id.</u>  Fitts testified that other symptoms included vomiting, diarrhea, and excessive sweating.

Fitts testified that she was prescribed a medication, Meclizine, to help with symptoms but that she tries to avoid excessive use of Meclizine because of dependency concerns as well as severe side effects which can last for several days. Fitts testified that she was very faithful to a physical therapy regimen and understood the importance of staying consistent with her treatment plan so that she could resolve her symptoms and return to work.  But the physical therapy only helped Fitts to a limited degree; it did not eliminate her symptoms.

Fitts testified that since the August 2020 onset she sleeps in a recliner because of concerns that sleeping in a bed will cause a recurrence of the completely debilitating symptoms.  Fitts testified that she sometimes postpones showers for one or two days when she feels unstable.  She testified that she makes careful decisions and avoids activities which are likely to cause a severe attack.

Fitts also filled out documentation indicating her limitations.  She wrote that her dependability was nonexistent and can make no plans or commitments because she does not know what her symptoms would be like on a given day until she wakes up in the morning.  See id. at 219.  She described her symptoms as "unpredictable" and erratic.  Some days her symptoms were mild; other days they are more extreme. On the extreme days she "stay[s] on the couch medicated."  Id.  Her symptoms cause fatigue, tire her mind, and disturb her sleep.  On a good day, Fitts stated that she is active for about three to four hours.  On days without bad symptoms, Fitts can buy groceries or quickly visit a friend.  Her stamina is limited.  She can read on good days and perform basic activities of daily living, including watching some television, walking outside, or talking on the phone.  Id. at 219-20.

She indicated she has "no problem" with personal care, except that on bad days she will "go slow or I just don't get dressed."  Id. at 220.  She indicated she can cook or bake on good days, but on bad days she can only make "something quick." Id. at 221.  On bad days she does not eat a lot due to nausea.

As to housework, on good days Fitts can "putter a little while" and perform tasks such as cleaning and laundry.  Id.  Fitts noted these tasks do not take her long because her home is small.  On bad days Fitts cannot do these tasks.  Fitts noted that it has taken her a month to clean her house, despite its small size, because of the infrequency of days with limited symptoms.  Because of the frequency of her symptoms, Fitts has "stayed home for weeks at a time."  Id. at 222.

11

Fitts stated that "any kind of movement brings vestibular symptoms on." Id. at 224. Her walking is limited and aggravates symptoms. Fitts indicated that this would occur with approximately 20 minutes of walking and that she would need to stop walking after that time without resuming.

Before her disability onset date, Fitts could ride a motorcycle, ski, fly on airplanes, swim, drive at night, and dance. She stated that, presently, she is trying to find a balance of activity to minimize her symptoms so that she can "still have some kind of life." Id. at 226.

IV.    ALJ's Unfavorable Decision

The ALJ issued an unfavorable decision on January 5, 2022. The ALJ found that Fitts was not disabled from August 10, 2020, through the date of the decision. At step one, the ALJ found that Fitts had not engaged in substantial gainful activity since the date of her claimed disability. At step two, the ALJ found that Fitts had one severe impairment, benign paroxysmal positional vertigo.[6] Specifically, the ALJ found that Fitts's benign paroxysmal positional vertigo "significantly limit[s] the ability to perform basic work activities . . . ." Id. at 85. At step three, the ALJ found that Fitts's impairments were not of the kind listed in Appendix 1 that automatically qualify a person as disabled. Accordingly, the ALJ moved to steps four and five.

---

[6] The ALJ considered other impairments which she did not find to be severe. Fitts does not challenge those findings.

At step four — after reviewing the record, Fitts's testimony, and considering Fitts's impairments — the ALJ found that Fitts had the RFC to perform light work, as defined under 20 C.F.R. §§ 404.1567(b) and 416.967(b).  The ALJ added several other limitations, which were no climbing ladders, ropes, or scaffolds; only occasional balancing, stooping, kneeling, crouching, and crawling; no working around unprotected heights and dangerous machinery; and no concentrated exposure to loud noise.  The ALJ found that Fitts was limited to a light range of work with the stated additional limitations "in consideration for the claimant's condition, which can cause symptoms of dizziness [and] vertigo . . . ." Id. at 90.  The ALJ did not include in her RFC any limitation for a person who might need to miss work for any amount of time or be off task for any amount of time.

The ALJ found that, generally, Fitts's medically determinable impairments could reasonably be expected to cause the symptoms she alleged.  However, the ALJ found that Fitts's statements about the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." Id. at 87.

The ALJ assessed the consulting medical opinions provided by Drs. Trice and Rimm and the opinions provided by Fitts's treating physician, Dr. Wise.  The ALJ found Drs. Trice and Rimm's opinions were "somewhat persuasive to the extent that they indicate the claimant's BPPV is not work preclusive." Id. at 90.  According to the ALJ, Drs. Trice and Rimm found that Fitts's vertigo-causing impairment was

non-severe <u>and</u> that she had no functional limitations associated with any physical impairment or combination of physical impairments.  <u>Id.</u>

The ALJ, however, found Dr. Wise's April 2021 and October 2021 opinions unpersuasive.  The ALJ found that Dr. Wise's April 2021 opinion was unpersuasive because it was "vague and appears to be based upon the claimant's subjective complaints."  <u>Id.</u>  The ALJ also found the opinion unpersuasive because Dr. Wise "did not provide a function-by-function assessment of [Fitts's] limitations nor did he support his opinion with any objective findings."  The ALJ also found the April 2021 opinion unpersuasive because it was inconsistent with a February 2021 treatment note which stated that Fitts "experienced significant improvement in her symptoms with vestibular physical therapy and vestibular testing was essentially normal[.]"  <u>Id.</u> at 90-91.

Lastly, the ALJ found that the record evidence was inconsistent with Fitts's statements about the intensity, persistence, and limiting effects of her symptoms.  The ALJ stated that the record showed that Fitts had not "experienced an episode of vertigo" since August 2020; that Fitts had reported "significant improvement" in her symptoms; and that Fitts use of medication "rarely" and refusal of other medication treatment "suggests her symptoms are not as severe as alleged."  <u>Id.</u> at 87.  The ALJ added that "her presentation on physical examinations has been largely unremarkable, and vestibular testing has been negative."  <u>Id.</u>  The ALJ observed that Fitts was able to independently tend to "daily" activities and was able to volunteer for church and engage in hobbies.  <u>Id.</u>  For example, the ALJ observed

14

that Fitts suffered symptom exacerbation after volunteering for a charitable function where she stood outdoors and waved at cars for 90 minutes.[7]

After determining Fitts's RFC, the ALJ found at step four that Fitts could perform past relevant work as a cleaner/housekeeper, "food assembler," and dental assistant.  Id. at 91.  Accordingly, based on her findings about Fitts's RFC, Fitts's past relevant work, and the vocational expert's testimony about the physical and mental demands of such work, the ALJ found at step four that Fitts was not disabled.

## DISCUSSION

Fitts argues that the ALJ's RFC findings are not supported by substantial evidence.  She contends that the RFC is without medical support; fails to give proper weight to the opinions of Dr. Wise; incorrectly finds that the intensity, persistence, and limiting effects of Fitts's symptoms were not fully substantiated; and incorrectly finds that Fitts can perform sustained work-related activities in a work setting.  Fitts contends that because the ALJ erred in her RFC findings, she consequently erred in finding Fitts not disabled at step four.

The Commissioner responds, arguing that the ALJ's RFC assessment is supported by substantial evidence, such as Fitts's normal physical examinations, normal testing; unremarkable brain MRI; her daily activities; reported

---

[7] Although the ALJ wrote that Fitts participated for 90 minutes, Fitts testified that she participated for "half an hour to an hour" and that after that point she "was getting really bad" and "had to stop" because of her symptoms.  AR at 57.

improvements to Dr. Wise; rare need for prescribed medication and effective symptom management; and the medical findings of Drs. Trice and Rimm.

As noted, a person's RFC is an assessment of "the most" the claimant can do despite her limitations.  See 20 C.F.R. § 404.1545(a)(1).  In formulating an RFC, the ALJ must consider "all of the relevant medical and other evidence" and all of the claimant's "medically determinable impairments" about which the ALJ is aware. Id. § 404.1545(a)(2), (a)(3).  "In determining a claimant's RFC, an ALJ must consider a claimant's subjective allegations of functional limitations, but she is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living."  E.g., Richards v. Kijakazi, 554 F. Supp. 3d 242, 252 (D. Mass. 2021); Richardson v. Saul, 565 F. Supp. 3d 154, 170 (D.N.H. 2021).

I.    The ALJ erred in weighing Dr. Wise's opinions.

Fitts contends that the ALJ improperly assessed the medical opinions in the record.  Specifically, she contends that the ALJ erred when she failed to find Dr. Wise's opinions persuasive while finding the state agency consultants' opinions "somewhat persuasive."

For purposes of determining a claimant's RFC, the ALJ considers the medical opinions and prior administrative medical findings in the administrative record.  20 C.F.R. § 404.1520c(a).  The ALJ determines the persuasiveness of medical opinions and findings by looking at the following factors:

- The medical opinion's supportability;

- the extent to which the medical opinion is consistent with evidence from other sources;

- the medical source's relationship with the claimant, including the length, frequency, purpose, and extent of the relationship;

- the specialization of the medical source (i.e., whether the medical source has received advanced education and training in a specialty and whether he or she opines about matters with that area of specialty);

- and certain other factors such as the familiarity of the medical source with the disability program.

Id. § 404.1520c(c). The most important factors are supportability and consistency.

Id. § 404.1520c(a); id. § 404.1520c(b)(2); Purdy v. Berryhill, 887 F.3d 7, 13 & n.8 (1st Cir. 2018).

The ALJ's weighing of Dr. Wise's opinion was not supported by substantial evidence. The ALJ found that Dr. Wise's opinions were not persuasive because: they were vague; they were based on Fitts's reports of her symptoms; he did not provide a function-by-function analysis of Fitts's limitations; and he did not cite objective findings. The record does not support any of these contentions. To be sure, Dr. Wise's opinions were expressed in medical terminology which may have been difficult to comprehend.[8] Specifically, Dr. Wise wrote that Fitts "has a history

---

[8] When faced with conflicting opinions or an insufficient or opaque medical record, the ALJ may seek an opinion from an independent medical expert to clarify matters, 20 C.F.R. § 404.1513a(b)(2). The ALJ may also request that the claimant undergo a consultative examination. § 404.1517. The ALJ did neither in this case, however.

of positional vertigo with presumed benign positional vertigo, with clinical course complicated by maladaptive vestibular compensation congruent with persistent postural perceptual dizziness, with likely additional cervicogenic dizziness trigger." AR at 392. Dr. Wise recited the evaluations and testing that corroborated his findings. He then stated that Fitts's "fluctuating and unpredictable dizziness symptoms have been severely limiting, and have led to limitations which have variably impacted this patient's ability to maintain activities of daily living, her ability to safely drive a vehicle, and have adversely impacted her capacity to effectively maintain participation at work." Id. Contrary to the ALJ's reasoning, a reasonable mind could not describe Dr. Wise's opinions as "vague." Likewise, a reasonable mind could not conclude that Dr. Wise's opinions lacked any objective findings because he based them on his examinations and testing of Fitts, as explained in his opinions.

The ALJ's other reasons for giving Dr. Wise's opinion no weight were also not supported by substantial evidence. Dr. Wise's findings were consistent with Fitts's description of her symptoms and limitations during medical examinations, as well as with Fitts's testimony during the hearing. The evidence was consistent that Fitts experiences ebbs and flows with her condition. And contrary to the ALJ's assumption, there is no requirement that a physician provide a function-by-function assessment of a patient's RFC as part of a medical opinion. See McDonald v. Kijakazi, No. 22-cv-86-JL, 2022 WL 17798108, at *5 (D.N.H. Dec. 19, 2022).

Further, Dr. Wise is an ENT specialist, which covers Fitts's impairments, while the state consultant physicians lack this specialty.

In sum, considering the relevant factors, the ALJ lacked substantial evidence to find that Dr. Wise's opinion had no persuasive weight.  Fitts has shown that the ALJ erred in her assessment of the medical opinion evidence in the record.  This error undermines the ALJ's RFC assessment and independently requires remand.[9]

II.    <u>The ALJ also erred by creating an RFC without substantial evidence to support it.</u>

In addition to erring in her evaluation of Dr. Wise's opinion, the ALJ also erred by constructing an RFC without substantial evidence to support it.  The ALJ found that Fitts had the RFC to perform light work with several additional limitations.  In support, the ALJ cited the opinions of Drs. Trice and Rimm; Fitts's "normal" test results; Fitts's testimony about statements about her daily activities and engagement in hobbies; and Fitts's failure to take additional medication beyond Meclizine or her failure to take Meclizine more often.

---

[9] The Acting Commissioner also argues that, if the court finds that ALJ's reasoning was insufficient, the ALJ's decision should nonetheless be affirmed because she should have automatically reduced Dr. Wise's opinion to no weight because he stated that Fitts's dizziness "adversely impacted" her ability to maintain participation at work.  The Acting Commissioner contends that this result is dictated by 20 C.F.R. § 404.1520b(c).  But § 404.1520b(c) merely states that the ALJ will not use as evidence or discuss various <u>statements</u> that are essentially conclusions of law, such as statements that the claimant is able or unable to work.  The regulation does not say that entire medical <u>opinions</u> must be, or can be, automatically reduced to no weight because they happen to contain <u>statements</u>, alongside appropriate opinion, that the claimant can or cannot work.

The First Circuit "has repeatedly held 'that since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.'" Jabre v. Astrue, No. 11-cv-332-JL, 2012 WL 1216260, at *8 (D.N.H. Apr. 5, 2012) (quoting Gordils v. Sec'y of HHS, 921 F.2d 327, 329 (1st Cir. 1990), and citing Rosado v. Sec'y of HHS, 807 F.2d 292, 293 (1st Cir. 1986), Berrios v. Sec'y of HHS, 796 F.2d 574, 576 (1st Cir. 1986), and Perez Lugo v. Sec'y of HHS, 794 F.2d 14, 15 (1st Cir. 1986)), report and recommendation adopted, 2012 WL 1205866 (Apr. 9, 2012).  Thus, "when assessing a claimant's RFC, '[t]he general rule is that an expert is needed to assess the extent of functional loss.'"  Roberts v. Barnhart, 67 Fed. Appx. 621, 622-23 (1st Cir. 2003) (citing Manso-Pizzaro v. Sec'y of HHS, 76 F.3d 15, 17 (1st Cir. 1996)).

The ALJ, however, may render "common-sense judgments" about a claimant's RFC based on the medical findings, so long as she "does not overstep the bounds of a lay person's competence and render a medical judgment."  Gordils, 921 F.2d at 329.  An expert's RFC is necessary when the record is such that understanding it "requires more than a layperson's effort at a commonsense functional capacity assessment."  Roberts, 67 Fed. Appx. at 623.

The ALJ's RFC was not supported by substantial evidence.  Specifically, the ALJ improperly drew unsupported inferences about the meaning of particular test results and statements in the medical records in relation to Fitts's functional limitations.  Cf. Johnson v. Astrue, 597 F.3d 409, 414 (1st Cir. 2009) (holding that

ALJ erred in part because she accepted the claimant's diagnosis but rejected the existence of its primary symptoms based on lack of "objective evidence" when condition was one for which medical tests typically return normal); Maio v. Astrue, No. 10-cv-235-JL, 2011 WL 2199845, at *4 (D.N.H. June 7, 2011) (observing that, for some conditions, normal test results are expected and do not undermine a claimant's disability claim).  Even if test results were "normal," the ALJ went beyond what a layperson could infer from those results in determining Fitts's limitations.  Because of Fitts's "symptoms of dizziness [and] vertigo" but in acknowledgement of the "normal" test results, the ALJ limited Fitts to a "range of light exertional work" with associated limitations.  But no medical opinion supported that connection.  The ALJ rejected entirely Dr. Wise's opinion, who proposed a more limited RFC with due consideration to Fitts's test results.  And both Drs. Trice and Rimm merely concluded that Fitts did not have a severe impairment, and neither offered an opinion about functional limitations on that basis.[10]  Neither Dr. Trice nor Dr. Rimm discussed the meaning of Fitts's test results in relation to Fitts's symptoms or what those tests did or did not indicate about Fitts's functional limitations.

---

[10] The Acting Commissioner argues that an ALJ only erroneously interprets "raw medical data" if she draws conclusions from "background medical test data" as opposed to a physician's view of the results.  See HALLEX I-2-5-14, 1992 WL 601806. The court agrees with the Acting Commissioner that the ALJ did not improperly use background medical test data to draw conclusions, and the ALJ was entitled to consider Fitts's "normal" test results as far as commonsense judgment could take them.  But in the context of this case and Fitts's medical conditions, the ALJ's findings about how those "normal" test results affected Fitts's allegations about the limiting effects of her symptoms went beyond commonsense judgment.

The other reasons the ALJ gave to support her RFC findings were similarly
insufficient.  The ALJ concluded that Fitts was overstating her alleged symptoms
because she could potentially be prescribed different medication or take additional
medication to reduce severe symptoms.  See AR at 615 (Dr. Wise October 18, 2021
treatment note stating that he and Fitts "discussed various potential medication
management strategies at this point, to supplement the benefits she received
through PT.  We have specifically discussed some evidence suggesting potential
benefit with SSRI treatment, and other evidence supporting considerations to an
SSNRI.").  The ALJ appears to have analogized Fitts's case to that of a claimant
who refuses to comply with a prescribed medication regime only to later claim that
her symptoms were debilitating.  See, e.g., Calabrese v. Astrue, 358 Fed. Appx. 274,
277-78 (2d Cir. 2009) (finding ALJ's decision supported by substantial evidence
where the claimant was "noncompliant" with prescribed medication regime).  That
analogy does not hold, here, however, because Fitts complied with the prescribed
medication regime and a medical decision was made between Fitts and her provider
to prescribe one medication and not another.  See Nguyen, 172 F.3d at 36 ("This
was not a case in which a claimant failed to seek treatment for symptoms later
claimed debilitating.").

The ALJ seems to have indicated that Fitts could have taken more Meclizine
to limit her symptoms and that this was a reason for finding that Fitts's symptoms
were not as severe as alleged.  But the medical records and Fitts's testimony show,
without contradiction, that Fitts took Meclizine as prescribed and reported

significant and potentially work-limiting side effects from it.  The ALJ did not discuss those undisputed side effects in her opinion.  See § 404.1529(c)(3) (stating that the "type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" will be considered).  In addition to ignoring the side effects of Meclizine, the ALJ also ignored the medical advice that Fitts received that Meclizine has "potential detrimental effects with overuse," as well as Fitts's testimony that was consistent with that understanding.  See AR at 615; id. at 45 (Fitts's testimony stating that "you can't get dependent on Meclizine").

The ALJ also supported the RFC with Fitts's occasional reports to treating medical providers that she was doing "better" than she had when she first reported experiencing severe symptoms in August 2020.  And the ALJ similarly relied on Fitts's testimony and written statements that she sometimes was able to do some tasks, such as usually keeping her house tidy and maintaining personal hygiene, as well as participating in a symptom-exacerbating church activity for approximately 90 minutes.[11]  Fitts, however, consistently reported that she had good days and bad days.  On good days, she could perform limited activities for briefs periods of time up to four hours.  On bad days, she could perform no activities.

---

[11] As noted, Fitts testified that it was half an hour to an hour of activity, not 90 minutes as the ALJ found.  But even if Fitts had participated in this activity for 90 minutes as opposed to merely 30 or 60 minutes, it would not make a difference as it hardly compares to the amount of work for which the ALJ found Fitts capable.

And, notably, Fitts's reports about doing "better" were always qualified. That is, Fitts reported doing "better" relative to having previously been incapacitated by symptoms of vertigo. Contrary to the ALJ's insinuation, there is no evidence that Fitts stated she was "better" in the sense that she was able to resume more than limited activity. For example, a February 2021 treatment note states that Fitts reported she was "definitely better" but only in the sense that her "[d]izziness was significantly worse Aug/Sep 2020," as she "'still ha[s] issues' with dizziness." AR at 378. Fitts consistently reported that she limits her activities to avoid exacerbating her symptoms. The same note observed that Fitts "[n]otes symptoms often after 'trying to do too much' with respect to exercising and other life activities." Id. Other notes after the disability onset period reflect the same: improvement from the debilitating episode of August 2020, but only insofar as Fitts learned she could limit her symptoms by greatly limiting her exertion. See, e.g., id. at 412 (March 18, 2021 note stating that "Patient reports that symptoms have been worse [since February tests], like I'm taking 2 steps forward and 3 steps backward. Patient describes a day that she had an extra cup of decaf coffee, and it felt like something broke loose. Patient took a small amount of meclizine that night, then woke up with a headache for 2-3 days. . . . [S]ymptoms were worse with that . . . ."); id. at 407 (May 6, 2021 note stating that "Patient reports feeling a little looser, experiencing an exacerbation of symptoms after standing in place for a long period while having a telephone conversation and rocking in place."); id. at 426 (October 18, 2021 note stating that, since last office visit in February 2021, Fitts "had felt like her dizziness

24

subsided somewhat" but "[n]onetheless, she does acknowledge continued constant dizziness with periodic exacerbations best characterized as disequilibrium with spells of rocking vertigo sensation lasting minutes to hours to days. Problems consistently worse when upright and with activity. She continues to note a distinct exacerbation of symptoms with increase visual flow, or when in environments involving complex sensory processing demands."). Considering the treatment notes in whole, the ALJ did not reasonably find inconsistencies between Fitts's reports to medical providers and Fitts's allegations about the limiting effects of her symptoms. Substantial evidence does not support these findings.

In sum, the ALJ's RFC findings were not based on substantial evidence and went well beyond "a layperson's effort at commonsense functional capacity assessment," which requires the ALJ's findings to be vacated. See Roberts, 67 Fed. Appx. at 623.

III. <u>While it was Fitts's burden to establish her functional limitations, she submitted evidence which did so, and the ALJ nonetheless has a duty to develop an adequate record for which she can draw a reasonable conclusion.</u>

As a final matter, the Acting Commissioner argues that reversal or remand is inappropriate because it was Fitts's burden to establish her functional limitations, not the Acting Commissioner's burden. But even when the claimant has the burden of proof, the ALJ has a duty to "develop an adequate record from which a reasonable conclusion can be drawn." Carrillo Marin v. Sec'y of HHS, 758 F.2d 14, 17 (1st Cir. 1985) ("[I]f the Secretary is doubtful as to the severity of [the claimant's] disorder the appropriate course is to request a consultative evaluation, see 20 C.F.R. §

404.1517, not to rely on the lay impressions of the ALJ.  While claimant of course bears the burden of proof on the issue of disability . . . the Secretary nonetheless retains a certain obligation to develop an adequate record from which a reasonable conclusion can be drawn.").  Once the ALJ found that Dr. Wise's opinions had no persuasive weight, the record lacked a credited opinion discussing Fitts's functional limitations considering her test results and the rest of her medical history.  Instead of attempting to craft an RFC based on unsupported inferences about the meaning of the medical evidence, the ALJ should have, at minimum, sought an additional consultative medical opinion.  See id.

## CONCLUSION

For the foregoing reasons, Fitts's motion to reverse (doc. no. 5) is granted and the Acting Commissioner's motion to affirm (doc. no. 7) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), this case is remanded to the Acting Commissioner for further proceedings consistent with this order and, if the ALJ deems it appropriate, the taking of additional evidence and testimony.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 12, 2023

cc:    Counsel of Record